CITY OF AUSTIN, Appellant,

v.

Leroy POWELL, Appellee.

No. 10637.

Court of Civil Appeals of Texas.

Austin.

Feb. 25, 1959.

See also 156 Tex. 610, 299 S.W.2d 273.

Doren R. Eskew, City Atty., Robert J. Potts, Jr., Asst. City Atty., Austin, for appellant.

Byrd & Davis, Austin, for appellee.

ARCHER, Chief Justice.

This appeal is from a judgment awarding total permanent disability to appellee for a calcium deposit in the tissues of his leg, alleged to have been the result of an injury in February, 1955, wherein appellant defended on the ground that the calcium deposit was the result of an injury in January, 1955, prior to the date upon which the Workmen's Compensation applied to appellant City of Austin.

The appeal is on seven points which are that the court erred in submitting Special Issue No. 1 inquiring whether appellee sustained an accidental injury to his right knee on or about the 14th of February, 1955, because there was no testimony to support the finding of the jury; that there was insufficient evidence as a matter of law to support a finding that the calcium deposit, the cause of appellee's disability, was the result of an accidental injury in February, 1955; that the court erred in not giving appellant's requested definition of "accidental injury", and in the manner Special Issue No. 3 was submitted, because the issue does not inquire as to causal connection between a February injury and the resulting disability; in submitting Special Issue No. 4, because there was no credi-ble evidence that any event in February, 1955 was a producing cause of the calcium deposit in appellee's leg, and in the manner of submission of Special Issue No. 4 in the use of the word "injury", and in over-ruling appellant's First Special Exception to the effect that the notice of claim provision of the Austin City Charter is applicable to a claim for Workmen's Compensation.

Appellee says that the jury verdict was amply supported by the evidence and that appellant's requested definition of "accidental injury" was properly refused, and that the issue inquiring if appellee sustained any total disability was properly submitted, as was Issue No. 4, and that the notice of claims provision in the City Charter has no application to this, a claim for Workmen's Compensation.

We believe that Special Issue No. 1, reading:

"Do you find from a preponderance of the evidence that Leroy Powell sustained an accidental injury to his right knee on or about the 14th day of February, 1955, while in the course of his employment with the defendant, City of Austin?

"The term 'accidental,' as used in this charge, means an undesigned, unforeseen and unexpected occurrence or mishap.

"The term 'injury', as used in this charge, means damage or harm to the physical structure of the body and such disease or infections as naturally result therefrom, or the incitement, acceleration or aggravation of any disease or injury previously existing, by reason of such damage or harm to the physical structure of the body.

"Answer this Special Issue Yes or No.

"Answer: Yes."

correctly submitted the question and that

the finding of the jury has reasonable support in the evidence.

Appellee was injured on January 14, 1955 and received treatment and after some weeks returned to work ánd testified that he went back to work sometime in February, 1955, around the 11th or 14th, but could not give an exact date and that:

"Q. All right. What happened this second time you hurt this knee? A. Well, after I hurt this knee then—

"Q. How did you hurt it? A. Well, I mean I jumped into a ditch. I either bumped it against the banks of the well, which I estimate it was about a six foot ditch. I either struck it with an air hammer or some rocks extending outside the ditch because the air hammer was standing pretty close.

"Q. How did you jump into the ditch,—how did you turn your body? A. Well, I just caught hold to it and jumped into the ditch and swung down into it and my feet swung around and my feet couldn't touch bottom and that caused me to strike my knee—the inside of my right knee.

"Q. And you hit your right knee again? A. Yes, sir.

"Q. What did you do then? A. Well, about fifteen minutes after then, well, it commenced paining me and paralyzing me again and then I went and reported it to my foreman what had happened.

"Q. What did you tell your foreman? A. Well, I disremember whether I told him—I was hurting so bad, whether I said I hit it against the bank or what, but I did ask him would he send in a report where I could go back to the doctor.

"Q. You asked him if he would send in a report so you could go back to the doctor? A. Yes, sir.

"Q. Did you tell him that you had re-injured your knee? A. I disremember.

"Q. You don't remember whether you did or not? A. No, sir, I don't.

"Q. Is there any reason why you wouldn't have told him that you rehurt it? A. Yes, sir, I believe I would, because after I explained to him about sending me back to the doctor, why, he said that he couldn't report it, for me to report it myself; he cut me off and I didn't say any more to him. That was the answer he give me.

"Q. He told you to report it yourself? A. Yes, sir.

"Q. All right. What did you do then? A. Well, I don't know; I worked that evening; I believe I just fooled around that evening. It was either the next day or two days after then that I was sent back to the doctor.

"Q. Sent back to the doctor. Who was it that sent you back to the doctor? A. Mr. Jones.

"Q. Who is Mr. Jones now? A. Well, I disremember whether he was the superintendent or what. He was an official of the city.

"Q. He was with the city? A. Yes, sir.

*   *   *   *   *   *

"Q. All right. Now, after Mr. Jones sent you back to the doctor,— what doctor did he send you to? A. Back to Dr. Graham.

"Q. What did Dr. Graham do? A. Well, Dr. Graham said that there wasn't anything else that he could do, so he transferred me to Dr. Lowry.

"Q. To Dr. Lowry? A. Yes, sir.

"Q. How was your knee then? A. Well, my knee was all swolled up, paining me, all strutted out.

"Q. And he sent you to Dr. Lowry? A. Yes, sir.

"Q. What did Dr. Lowry do for you? A. Well, Dr. Lowry, he taken x-ray pictures of it, and what I would call give me some injection shots—I don't know what you call them—with needles and so forth, all like that, and then he referred me to go to the hospital.

"Q. To the hospital? A. Yes, sir.

"Q. What hospital? A. Brackenridge.

"Q. And he put you in Brackenridge Hospital? A. Yes, sir.

"Q. Do you remember about how long you were in the hospital, Leroy? A. No, sir, I don't. It ought to have been fifteen days—twelve or fifteen days, I would say.

"Q. Twelve or fifteen days? A. Yes, sir.

"Q. Did Dr. Lowry keep treating you after you got out of the hospital? A. Yes, sir, he did for a while.

"Q. When did Dr. Lowry treat you last? A. As near as I can remember it must have been in the month of May, I think was my last treatment.

"Q. May of '55? A. Yes, sir.

*     *     *     *     *     *

"Q. Well, now, in May of 1955 when Dr. Lowry stopped treating you, how was your knee then? A. Well, it wasn't getting any better. That is why he told me to go to Dr. Garcia. I wasn't able to do any work, and I wasn't getting any better.

"Q. Well, why didn't Dr. Lowry continue treating you? A. Well, I supposed he wanted me to pay him or wanted somebody to pay him, and I didn't have any money.

"Q. But he wouldn't give you any more treatment? A. No, sir.

"Q. And is that when you went to Dr. Garcia? A. Yes, sir.

"Q. Did Dr. Garcia treat you? A. Yes, sir.

"Q. What did he do for you? A. Well, Dr. Garcia done the same thing, give me some pills, and I think give me some injection shots.

"Q. Anything else? A. I think that is all I can remember.

"Q. Did he send you back to the hospital? A. Yes, sir, I think he did.

"Q. Brackenridge Hospital? A. If I can remember, I think he did.

"Q. You think he did? A. Yes, sir.

"Q. Did he treat you after you got out of the hospital? A. Yes, he did.

"Q. About how long did he treat you? A. Dr. Garcia must have treated me up until the year 1956, but I disremember now what month he began treating me, '55 or '56.

"Q. Sometime in '56? A. Yes, sir, I disremember.

"Q. Leroy, did you ever go back to work for the city? A. No, sir, I never did.

"Q. Have you done any other hard work? A. No, sir, I haven't.

"Q. Have you done any kind of work of any kind? A. Well, yes, sir, I have, in the way of shining shoes. That is the only thing that I do.

"Q. You have been shining shoes? A. Yes, sir.

"Q. But you haven't done any manual labor that you used to do before? A. No, sir.

*     *     *     *     *     *

"Q. How is your knee today, Leroy? A. Well, it is still stiff, and I can't straighten it out, and it is still pain-

ing me. If I get up pretty fast or jump off of something, if I do a lot of walking, I still suffer with it.

"Q. You can't straighten your knee out? A. No, sir.

"Q. How does that make you walk on it? A. Well, I walk on my toes.

"Q. Walk on your toes? A. Yes, sir.

\* \* \* \* \* \*

"Q. Do you hurt anywhere else, Leroy? A. Yes, sir, across my back, the lower part of my back. All across my back, it hurts me.

"Q. When does that hurt you in your back? A. Well, just like I do lots of walking and stand up for a long time, it pains me.

"Q. Leroy, are you able now to do manual work? A. No. sir.

"Q. Why not? A. Well, on account of my knee and my back won't allow it.

"Q. Does that back hurt you when you shine those shoes a little bit? A. If I stay bent over any length of time, it does.

"Q. Why do you do it? A. Well, I have got to try to make a living some kind of way.

"Q. I believe you said you were married, didn't you, Leroy? A. Yes, I am.

"Q. Does she work? A. Yes, sir."

On cross-examination appellee testified that the City paid for the hospital and doctor's bills for the first injury, and salary while he was off from work; that he went back to work in February and was reinjured on the 10th or 14th of February, and did not remember the day of the week.

The witness testified that he was sent to Dr. Graham and then to Dr. Lowry about three days after he was injured; that he remained on the payroll until May; that in going into the ditch he bumped against the bank of the ditch where rocks were sticking out, or an air hammer; that he walked with a limp and could not straighten his leg out, and that his leg has been stiff since February.

Appellant's wife, Gertrude Powell, testified that appellant's knee was swollen in January and that she put alcohol on it, and that after the injury in February the knee was swollen again and appellant was walking with a limp; that he complained that he was in pain and that she rubbed the knee with alcohol.

Dr. John Garcia testified that the condition from which Leroy suffers is the calcification of the ligament in his knee, which does not occur unless there is a reinjury to an existing injury; that he first saw Leroy Powell about May 17, 1955 and examined him and found that Powell was unable to walk properly; that Powell gave a history of being injured and having been under treatment of a couple of other doctors and that Powell was totally disabled and unable to work.

In answer to a hypothetical question detailing Powell's injuries and treatment Dr. Garcia testified that the reinjury in February 1955 was the producing cause of the calcification of the ligament and the cause of the disability to his knee and in turn to his back.

Dr. Lowry, called by appellant, testified that he first saw Powell on February 18, 1955, and made a physical examination including an X-ray to the right knee and there was a localized area of swelling about the size of a dollar over the inner side of the right knee, extremely tender to pressure, and motion was slightly restricted and motion would be very painful; that a calcium deposit was shown by the X-ray over the inner side of the joint; that such is usually the result of an injury, such as a twisting of the knee, a blow on the outer side of the knee, which tends to bend it and

stretches that ligament, partially tears it, and occasionally from a direct blow; that the mass of calcium deposited will in time become a deposit of bone and that such deposit is from calcium carried in the blood stream.

The doctor further testified that you first begin to see the calcium deposit on the X-ray after three or four weeks; that the present deposit is an early one; that he treated Powell with hydrocortisone on February 21, 1955, and admitted him to the hospital on March 1st where he remained until March 17th, during which time Powell was given hydrocortisone by injection, X-ray treatment and physical therapy, heat and gentle massage and recommended exercises.

The doctor stated that Powell, in a history of the case, stated that he was injured on January 14, 1955, and after certain treatment, returned to work on January 24th; that he had no record of an injury on February 14th.

On cross examination Dr. Lowry testified that he last saw Powell on May 6, 1955; that the name of the condition inquired about was Pelligrini-Stieda syndrome and is an unusual condition; that he knew Dr. J. Kulowski, who was a recognized authority and a good orthopedic surgeon but he was not familiar with an article published in The American Journal of Roentgenology and Radium Therapy in 1942, entitled "Post-Traumatic paraarticular ossification of the knee joint" in which it was stated that the growth of the calcification may be precocious or delayed and roentgenographic shadows may appear at two, eight and nine days after an injury, but that he had never seen one occur that early.

The doctor further testified that a reinjury could aggravate the calcification condition and that the condition is permanent.

There was extensive testimony given as to Powell's injury but we believe that the recitation we have given herein supports the jury's finding, and of course the jury heard all of the witnesses.

We believe that the evidence is sufficient to show that the injury received by Powell in February was "accidental."

■ Since the appellant did not plead or offer proof as to whether Powell's injury was accidental but took the position that Powell was not injured at all in February, the court was not required to submit an instruction defining the word "accidental" as "an undesigned, unforeseen and unexpected occurrence or mishap." Texas Employers Insurance Association v. Agan, Tex.Civ.App., 252 S.W.2d 743, er. ref.

■ Appellant complains of the wording of Special Issue No. 3, which reads as follows:

"Do you find from a preponderance of the evidence that the plaintiff sustained any total disability following the injury, if any, previously inquired about?

"The term 'total disability', as used in this charge, does not imply an absolute disability to perform any kind of labor, but a person disqualified from performing the usual tasks of a workman in such a way as to enable him to procure and retain employment is regarded as being totally incapacitated or totally disabled."

The jury gave an affirmative answer to this issue.

The objection is that the issue does not inquire as to causal connection between the February injury and the resulting disability.

Any error in the submission of this issue was harmless, since the only injury inquired about was the one in February, 1955.

Issue No. 4 asked if the injury, if any, previously inquired about, was a producing cause of the total disability, if any, sustained by the plaintiff, and followed by an appropriate definition of the term "pro-

**930**

ducing cause" and the jury answered that it was.

We believe that the testimony herein set out supports the answer of the jury.

 We do not believe that the Notice of Claim provision (Article XII, Section 7) of the Austin City Charter is applicable to a claim for Workmen's Compensation.

This point was raised by appellant by special exception only, and as a defense raised for the first time in the brief and may have been waived, but this is a claim for Workmen's Compensation and not a suit for damages for death, personal injuries or property damages, and as such this claim is not a common-law action for damages.

The benefits available under the Workmen's Compensation Act have been substituted for common-law actions for damages against the employer, and in a claim for compensation the injured employee has no action against his employer but against the insurance carrier.

Article 8306, Section 3, Vernon's Ann. Civ.St.

If appellant had elected to provide insurance coverage by the payment of a premium, it would not have been a party to this suit, but having elected to be a self-insurer, the appellant is a party only as an insurer and as such this suit is not against the City as an employer.

If appellant had elected to pay premiums for coverage to an insurance company such company could not have raised the defense which the City attempts to raise, and require one claiming to be entitled to compensation to first comply with the Notice of Claims provision in the City Charter. Appellant is in no different position than such company. City of Austin v. Powell, 156 Tex. 610, 299 S.W.2d 273.

When the City Council elected to insure all of its employees under the Workmen's Compensation Law, it chose to adopt the 30-day notice provision of such law. Article 8307, Section 4a, V.A.C.S.

There was an admission that notice was given within 30 days after the 14th of February, 1955, that Powell was claiming to have sustained an accidental injury.

The Workmen's Compensation Act establishes its own "prerequisites to bring suit," and any other prerequisite is inconsistent to this general law.

The judgment of the Trial Court is affirmed.

Affirmed.